**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------X
VINCENT ROMANO, JR.,                                    Case #:

*Plaintiff,*

- *against* -                                    <u>**VERIFIED COMPLAINT**</u>


NORTHROP GRUMMAN CORPORATION and        **PLAINTIFF DEMANDS**
NORTHROP GRUMMAN SYSTEMS CORPORATION,
                                                **A TRIAL BY JURY**
                                *Defendants*.
--------------------------------------------------------------------------X

  Plaintiff, **VINCENT ROMANO, JR.**, complaining of the Defendants, **NORTHROP**

**GRUMMAN CORPORATION and NORTHROP GRUMMAN SYSTEMS**

**CORPORATION**, by his attorneys, **DELL & DEAN, PLLC**, alleges upon information and

belief as follows:

<u>**JURISDICTION AND VENUE**</u>

  1.  Plaintiff is an individual who is a resident and/or property owner in Nassau County,

New York and domiciled in New York. Plaintiff, at the time of sustaining the injuries complained

of herein was an occupant of certain real property located near the real property and facilities of

approximately 635 acres in the East-Central Nassau County, formerly known as the Grumman

Aerospace-Bethpage Facility Site, and including the Northrop Grumman – Bethpage Facility, the

Naval Weapons Industrial Reserve Plant – Bethpage ("NWIRP"), and the Grumman Steel Los Site

(collectively, "the Site").

  2.  Upon information and belief, Defendants Northrop Grumman Systems Corporation

and Northrup Grumman Corporation are corporations incorporated under the laws of the State of

Delaware, with a principal place of business in Falls Church, Virgina.   Jurisdiction is properly

based on the parties' diversity of citizenship.

3.    Further, Grumman Aeronautical Engineering was incorporated in New York in 1929 and changed its name to "Grumman Corporation" in 1969. Grumman Corporation's headquarters were in Bethpage, New York. Grumman Aerospace Corporation was a subsidiary of Grumman Corporation, with its principal place of business in Bethpage, New York. Collectively, Grumman Corporation and Grumman Aerospace Corporation are referred to as "Grumman."

In 1994, Grumman was acquired by Northrop Corporation. The two companies merged in 1995 to become Northrop Grumman Corporation ("NG"). Over its almost six decade existence, Grumman generated, stored, and disposed of toxic contaminants and manufacturing byproducts such as arsenic, cadmium, chromium, lead, mercury, polychlorinated biphenyls ("PCBs"), metals, and volatile organic compounds ("VOCs") at its facilities and at landfills used by multiple parties to dispose of wastes, including Grumman, as part of its routine and ordinary course of business. These practices resulted in extensive pollution at or emanating from Grumman's facilities identified in this Amended Complaint (the "Site"), and which is presently injuring Plaintiff.

4.    Due to the negligent, willful, and/or wanton actions of the Defendants, an unknown quantity of toxic chemicals, toxic contaminants and industrial solvents, including but not limited to VOCs such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, and carbon tetrachloride (collectively, the "Contaminants") have been spilled at the Site and created a massive migrating plume of contaminants now polluting the sole source aquifer in the area of the Site relied upon by Plaintiff, and injuring Plaintiff's person and real property.

5.    Since 2005, there has been an ongoing investigation of the contamination plume emanating from the former Grumman Settling Ponds, now known as the Bethpage Community Park, which is currently owned by the Town of Oyster Bay, designated as Operating Unit 3 ("OU-3"). During the ongoing investigation of the plume, Defendants, the New York State Department

of Environmental Conservation ("NYSDEC"), and the U.S. Navy expressed their belief that they possessed a good understanding of the scope of the contamination plume emanating from the Site.

6.      However, the plume's presence resulted in the migration of the contaminants onto Plaintiff's properties, causing Plaintiff to suffer ongoing injuries, including significant health impairments and damages to his personal properties, as well as the contaminant's damaging effect to his future health concerns.

7.      This Complaint states individual claims based on negligence, abnormally dangerous activity and absolute and strict liability, trespass, nuisance, and claims for medical monitoring and property damages.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

8.      This is an action brought by and on behalf of the Plaintiff arising out of the prior and continuing release, discharge, and deposit of toxic and hazardous substances and contaminants into Plaintiff's neighborhood and onto Plaintiff's properties and persons, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.

### *The Contaminants*

9.      As used herein, TCE shall include all of its trade names including but not limited to Acetylene, Anameth, Benzinol, Pholex and any of its degradation breakdown products.

10.     TCE is a colorless, volatile, man-made liquid chemical that is used by industry as, among other things, a solvent to remove grease from metal parts.

11.     TCE can be released into the air, water, and soil and places where it is produced or used. The United States Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer ("IARC") classify TCE as a human carcinogen.

12.    TCE can enter groundwater systems through improper disposals or leaks into the ground. TCE is highly mobile once it enters the soil and will result in substantial percolation into groundwater aquifers. TCE can remain in groundwater for long periods of time since it is not able to readily evaporate from groundwater.

13.    TCE is extremely toxic to humans, even at low concentrations. TCE can enter the body from the air, water, or soil. Acute exposure to TCE has been shown to affect the central nervous system, liver, and kidneys in humans. Chronic exposure to TCE may cause liver and kidney damage, impaired immune system function, and impaired fetal development in pregnant women. TCE is "toxic by inhalation, by prolonged or repeated contact with the skin or mucous membrane, or when taken by mouth."

14.    PCBs are an odorless group of volatile synthetic organic chemicals and are either oily liquids or solids. PCBs enter the environment as mixtures containing a variety of individual chlorinated biphenyl components, known as congeners, as well as impurities.

15.    A manufacturing ban for PCBs in the United States took effect in 1979 because there was evidence that PCBs build up in the environment and may cause harmful effects.

16.    Once released into the environment, PCBs do not readily break down and therefore remain for long periods of time cycling between air, water, and soil. PCBs can be carried long distances and have been found in snow and sea water in areas far away from where they were released into the environment.

17.    PCBs have been demonstrated to cause cancer, as well as a variety of other adverse health effects on the immune system, reproductive system, nervous system and endocrine system.

18.    Upon information and belief, Grumman began using TCE and PCBs at the Site in the 1940s.

19.    2-butanone (Methyl ethyl Ketone) is a colorless and volatile liquid used as a solvent

and an additive for making other chemicals.

20.     As used herein, tetrachloroethylene shall include all of its trade names including but not limited to PERC, tetrachloroethylene, perchloroethylene and PCE, and any of its degradation breakdown products.

21.     PERC is a manufactured chemical that is widely used for degreasing metal parts and in manufacturing other chemicals.

22.     In humans, PERC is known to affect the central nervous system, the liver, kidneys, blood, immune system and the reproductive system.

23.     Epidemiological studies provide a pattern of evidence for a positive association between PERC exposure in the workplace and several type of cancer, specifically bladder cancer, non-Hodgkin lymphoma and multiple myeloma.

24.     As used herein, 1,1,1-Trichloroethane shall include all of its trade names including but not limited to methylchloroform, methyltrichloromethane, trichloromethylmethane, and trichloromethane.

25.     1,1,1-Trichloroethane was often used as a solvent to dissolve other substances, such as glues and paints, and to remove oil or grease from manufactured parts.

26.     1,1,1-Trichloroethane in groundwater can evaporate and pass through soil as a gas and finally be released to the air.

27.     As used herein, 2-hexanone shall include all of its trade names including but not limited to methyl n-butyl ketone and MBK.

28.     2-hexanone is a clear colorless liquid that when in liquid form, evaporates into the air as a vapor.

29.     2-hexanone was formerly used in paint and paint thinner and in various chemical substances. However, since it was found to have harmful health effects, it is no longer made in the

United States, and its uses have been restricted.

30.     2-Hexanone can enter humans when breathing its vapors, eating food or drinking water that contains it, or coming in contact with it through the skin.

31.     As used herein, Carbon tetrachloride shall include all of its trade names including but not limited to carbon chloride, methane tetrachloride, perchloromethane, tetrachloroethane, or benziform.

32.     Carbon tetrachloride is a manufactured chemical that does not occur naturally and Carbon tetrachloride was used as a cleaning fluid and degreasing agent, in fire extinguishers, and in spot removers. Because of its harmful effects, these uses are now banned and it is only used in some industrial applications.

33.     Carbon tetrachloride is known to affect the cardiovascular, hepatic, and nervous systems in humans.

34.     Carbon tetrachloride can be trapped in groundwater for long periods of time, and will eventually evaporate into the air. Carbon tetrachloride does not generally stick to soil particles.

35.     After exposure to high levels of carbon tetrachloride, the nervous system, including the brain, is affected.   Such exposure can be fatal.

36.     Upon information and belief, all the above-referenced contaminants, and his derivatives, in amounts and concentrations above State and Federal residential and industrial, safety levels, were and continue to be released, discharged, and disbursed throughout the neighborhood from the Site.

### *Grumman's Ownership and Use of the Site*

37.     Grumman owned and/or operated facilities on approximately 600 acres in east central Nassau County, formerly known as the Grumman Aerospace-Bethpage Facility Site, and including the Northrop Grumman – Bethpage Facility, the Naval Weapons Industrial Reserve Plant

– Bethpage ("NWIRP"), and the Grumman Steel Los Site (collectively "the Site"), from which hazardous substances were released which are now contaminating and/or threatening to contaminate Plaintiff's person and real property.

38.    Grumman began operations at the Site in Bethpage, New York in the late 1920s – early 1930s. The Site location is situated in close proximity to nearby homes.

39.    Throughout its operations, Grumman used, stored and disposed of various hazardous wastes and solvents from industrial processes directly into the environment. These wastes included VOCs, such as TCE. Upon information and belief, Grumman's operations also would have included the use, storage and disposal of radioactive materials, including radium, perchlorate, and disposal of other industrial solvents, including but not limited to 2-butanone, 2-hexanone, and 1,1,1-Trichloroethane.

40.    Grumman manufactured and tested airplanes, weapons and satellites at the Bethpage Facility. Upon information and belief, in connection with its operations, it used, stored and disposed of various contaminants and solvents at the Site, including but not limited to VOCs (one of which, TCE, was used as a degreaser for metal parts), PCBs, and others.

41.    Upon information and belief, NGSC ceased all manufacturing operations at the Site in approximately 1996.

42.    Upon information and belief, Grumman's use and storage of VOCs at the Site, including TCE, occurred primarily at Plants # 1, #2, #3, #5 and #12 within the Site.

43.    Upon information and belief, Plants #1, #2, and #3 each contained a form of vapor degreaser that used the contaminant TCE.

44.    Upon information and belief, at least eight (8) TCE degreasers operated at Plant #2 from the 1960s through the mid-1990s; at least six (6) TCE degreasers operated at Plant #3 at various times spanning the 1960s through the 1980s; at least one (1) TCE degreaser operated at

Plant #5 between the 1960s and two (2) in the 1970s; and Plant #2 also used degreasers outfitted with spray wands that used TCE.

45.    Spray wands were used to degrease large parts, such as wings of planes. To perform this task with a spray wand, a Grumman operator would have to stand on a platform along the degreaser's side.

46.    Grumman's operations at the Site included painting airplanes. There were paint shops on the grounds of the Bethpage Facility for this purpose. TCE was used to clean the paint guns used in the paint booths. To do this, the paint gun would be aimed at the paint curtain and discharged.

47.    A "waterfall" in a paint shop was intended to keep sprayed paint from escaping. Water circulated through a closed system and cascaded down the sides of the paint shop to catch paint overspray; water also circulated through troughs on the floor of the paint shop and then back through the waterfalls.

48.    The paint shop consisted of one room and three waterfalls. Grumman's practice was to clean each spray booth re-circulating tank weekly. Water residue would be pumped to a tank truck and taken to Grumman's on-site waste treatment Plant – the toxic wastewater treatment sludge generated at the Grumman Aircraft Engineering Corporation Plant #2 Industrial Wastewater Treatment Facility ("Plant #2") was transported to the Park property and placed in one of two sludge drying beds.

49.    The wastewater treated at the Plant #2 Industrial Wastewater Treatment Facility resulted from metal finishing operations conducted at both Plant #2 and Plant #3 at the NWIRP property.

50.    The area where the sludge drying beds were located was enclosed by a chain-link fence, which was secured by a locked gate. This fenced area is visible in available aerial

photographs dated between the 1950s and 1962, when the property was transferred to the Town of Oyster Bay.

51.    Spent rags generated during the wipe-down process of a paint booth water curtain located at Plant #2 were transported to the fenced-in area of the Park property where they were emptied into a pit located on the property. Used oil may have also been discarded in the pit through these actions. Upon information and belief, these actions caused or contributed to the groundwater contamination plumes presently injuring Plaintiff.

52.    Upon information and belief, Plant #2 had a system to distill TCE. This system was contaminated with oil since it had been repeatedly used in degreasers and for cleaning, all so Defendants could reuse the expended TCE.

53.    Grumman dug "recharge basins" directly into the ground throughout the Bethpage Facility, which it used at least in part to dispose of wastewaters. The discharge basins were designed to allow the wastewater to infiltrate back into the ground and return to the groundwater supply relied upon by Plaintiff, creating the ongoing contaminant plume and soil and vapor contamination.

54.    Upon information and belief, there were at least a dozen recharge basins across the Bethpage Facility at various points in its operational history.

55.    When the discharge basins became clogged and water could no longer percolate into the ground, Grumman would run bulldozers to scrape the basins. The contaminated and noxious scrapings obtained from these discharge basins were then used to fill in other low-lying areas on the premises of the Bethpage Facility.

56.    Upon information and belief, starting in or about 1970, Grumman used a 4,000-gallon aboveground tank at Plant #2 to store TCE. At some point, Grumman discovered that the tank was leaking and had it replaced. It is unknown how long TCE had been leaking into the

ground before the leak was discovered, but Grumman was aware of an unexplained "loss" of TCE for an estimated two or three years prior to discovery of the leak.

57.     Upon information and belief, after an uncontrolled quantity of TCE was discharged into the soil, Grumman finally replaced Plant #2's leaking tank and discovered the bottom of the tank was already rotten.

58.     Upon information and belief, toxic PCB-containing fluid was released into the storm water system via floor drains in Plant #3. The piping in the floor drains led the harmful PCB releases to the storm drains, which carried into the leaching pools Grumman had constructed, and ultimately led to the recharge basins, and finally, into the groundwater. ***Bethpage Community Park and Former Grumman Settling Ponds***

59.     Town of Oyster Bay is the current owner and operator of the land that comprises the current Bethpage Community Park (the "Park"), was originally predominantly farmland and was purchased by the Grumman Aircraft Engineering Corporation, a predecessor of Northrop Grumman in 1941.

60.     In October of 1962, Grumman Aircraft Engineering Corporation donated approximately 18 acres of this former farmland, approximately located near the intersection of Stewart Avenue and Cherry Avenue in Bethpage, New York, to Town of Oyster Bay for use as parkland which became the Park. Shortly thereafter, the Park as it appears today was constructed on the property and has been and continues to be accessible to community residents year round. The Park contains a ball field area, an active storm water recharge basin, a parking area, the Town Ice Skating Rink, and the Town Pool.

61.     Within the Park, the ball field area was built over the location of the "Former Grumman Settling Ponds." The Former Grumman Settling Ponds represent approximately 3.75 acres located within the 18 acres of the Park.

62.     Prior to becoming a Park, from approximately 1949 through 1962, Grumman utilized the Former Grumman Settling Ponds area to dispose of various wastes generated by industrial operations at the Site, including chromium, PCBs and VOCs used for cleaning or degreasing machinery or fabricated parts. These actions resulted in the release of PCBs into the surrounding soil within the Park at levels exceeding the 50 parts per million ("ppm") threshold established by the EPA.

63.     NGSC remains the current owner of the Grumman Access Road, a closed private road in the vicinity of the Park associated with the former Plant.

64.     On or about March 18, 2005, the DEC signed an Administrative Order on Consent with Town of Oyster Bay that required and obligated the Town of Oyster Bay to develop and implement a remedial program to undertake a clean-up of Park Property because of the presence of hazardous waste and contamination at the Park Property.

65.     After the Administrative Order, the Town of Oyster Bay then entered into an order for an interim remedial measure (IRM) to investigate and remediate 7 acres of the Park in July of 2005. Thereafter the Town of Oyster Bay was formally identified as a potentially responsible party (PRP) and has been responsible for continued contamination emanating from the Park, including the excavation and off-site disposal of approximately 175,000 cubic yards of soil contaminated with the chlorinated solvents, PCBs, metals and Freon compounds dichlorodifloromethane (R-12) and chlorodifloromethane (R-21).

66.     Despite the Orders, the groundwater, containing volatile organic compounds (VOCs) from the Park, migrates to the south-southeast. As it does so, immigrates through deeper and deeper portions of the aquifer. As a consequence, VOCs that have been discharged from the Park owned by Town of Oyster Bay have seeped into the groundwater and have moved into the soil vapor (air spaces within the soil) of Plaintiff, affecting the indoor air quality and causing the

injuries described of herein.

67.     Upon information and belief, to date the Park has not been remediated and Contaminants originating from the Park continue to injure Plaintiff.

### *OU-1, OU-2, and OU-3 Plumes*

68.     Upon information and belief, Grumman had several wells at the Site from which water was pumped for human consumption and for industrial purposes at the Site.

69.     In 1983, the Grumman Aerospace-Bethpage Facility Site was listed in the Registry of Inactive Hazardous Waste Disposal Sites in New York State.

70.     In 1989, Northrop Grumman signed a Remedial Investigation/Feasibility Study Order on Consent for Operable Unit 1 ("OU-1") and Operable Unit 2 ("OU-2").

71.     OU-1 encompasses the former manufacturing Plant area and includes three groundwater extraction wells which remove contaminated groundwater from the Site and pump it through an air stripping treatment system for the removal of VOCs.

72.     OU-2 consists of an extremely large groundwater contamination plume that is approximately 4.5 miles long and 3.5 miles wide and is continuously moving south-southeast. The source area of the OU-2 plume originates from both the NWIRP and Northrup Grumman properties, with VOCs present at different concentrations and different depths. OU-2 includes a network of monitoring wells which are used to monitor the off-site contamination plume.

73.     On or about October 25, 1990, Grumman entered into a binding consent order with NYSDEC that required Grumman to conduct the investigation and study at the Bethpage Facility.

74.     On March 9, 1992, Northrop Grumman signed an Order on Consent with the State of New York to perform a remedial investigation and feasibility study at the Site.

75.     In March and July of 1995, New York State executed Records of Decision ("ROD") for the Northrop Grumman and NWIRP Sites concerning on-site soil contamination in OU-1.

76.     In March of 2001, the NYSDEC issued a ROD for OU-2, which provided for wellhead treatment at impacted public water supply wells, boundary monitoring of the plume, and the contingency for additional wellhead treatment should other wells be affected.

77.     These RODs set forth remedial measures Grumman was required to implement to cure findings of environmental conditions in or around the Bethpage Facility.

78.     In March of 2002, Grumman retained the firm Dvirka and Bartilucci Consulting Engineers to conduct a soil sampling program solely within the Bethpage Community Park. The analytical results of the 60 soil samples taken in the Park indicated levels of PCBs exceeding the NYSDEC's SCO standard.

79.     In July of 2005, Northrop Grumman Systems signed a Remedial Investigation and Feasibility Study Order on Consent for the Former Grumman Settling Ponds, Adjacent Areas of the Bethpage Community Park, and the Grumman Access Road, collectively known as OU-3. OU-3 is located on the Long Island glacial sand deposits which have been designated as a sole source aquifer.

80.     The groundwater table at the Site is located at a depth ranging from 50 to 55 feet below ground surface ("bgs") in the Upper Glacial Formation. The groundwater flow direction is primarily horizontal with a downward component to the south-southeast in and around OU-3.

81.     Groundwater migration from the OU-3 area has resulted in a significant off-site groundwater plume which has impacted both the Upper Glacial and Magothy Formations. As the OU-3 groundwater plume leaves the site, as a distinct plume, it becomes comingled with the larger OU-2 Grumman/NWIRP groundwater plume. While generally comingled at depths of less than 400 feet, the OU-3 plume continues deeper than the OU-2 plume, extending to a depth of at least 550 feet below ground surface.

82.     The OU-3 plume, within the area-wide OU-2 plume, is deeper, narrower, varied in

width and is a more concentrated. This plume has VOC levels ranging from 5 ppb to 10 ppb, and extends approximately 5,400 feet down gradient of the Park boundary. Within the OU-3 plume an area of elevated concentrations, or "hotspot", plume of VOCs has been identified approaching the Bethpage Water District No. 4 well field.

83.     Upon information and belief, in a 2012 letter from Northrop to Travelers Insurance Company, Northrop estimated that it had spent $40,600,000 to date, but stated that those estimates did "not take into account all potential cost [] contingencies." Among these costs were those related to the installation of a soil vapor extraction system and an on-site containment system that Grumman continues to presently operate.

84.     The soil vapor extraction system was specifically "designed to remove the TCE in unsaturated soils" from a TCE "source area which was found adjacent to Plant 2." Upon information and belief, by the mid-1990s, Grumman had entered into an informal "handshake agreement" with the U.S. Navy relating to allocation of costs regarding the Bethpage Facility remediation and cleanup.

85.     The southeastern portion of the Park in OU-3 was utilized as a wastewater discharge recharge area, sludge drying bed area, and fire training facility where waste oil and jet fuel were ignited and extinguished. Upon information and belief, these actions caused or contributed to the current soil and vapor contamination injuring Plaintiff. As a result of Defendants' willful and reckless operations at the site, there is a large plume of groundwater contaminants, including TCE, in the Bethpage Area extending beyond the boundaries of the Site, impacting more than 2,000 acres, including Plaintiff's property. The plume has migrated onto Plaintiff's properties, causing contaminants including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride, to contaminate the soil, properties, and

homes of the Plaintiff, resulting in personal injury and property damage.

86. To date, Defendants do not know the extent or complete vertical or horizontal lineation of the contamination that exists from the Site.

87. The contaminants and hazardous substances from the property have been released, dispersed or otherwise discharged via groundwater, air and other manners onto the Plaintiff's properties and persons. This continues to this day.

### *Public Notice of the Cancer Outbreak in Bethpage*

88. In 2009, The New York State Department of Health (NYSDOH) began a study of cancers occurring among people living in a small area directly east of the NWIRP (Naval Weapons Industrial Reserve Plant) site or directly south of the former Grumman site in Bethpage (hereinafter the "NYSDOH Cancer Study").

89. The NYSDOH Cancer Study was not made public until 2012 and was very limited in scope. The study looked at cancers occurring among people living in two areas – a one-block area directly east of the NWIRP (bounded by 11th St., Sycamore Ave., 10th St. and Maple Ave.) where measurements had shown elevated levels of contaminants from the site in the air inside some of the homes, and a 19-block area surrounding that block and bordering the Grumman site.

90. While the NYSDOH Cancer Study did not show any evidence of cancer patterns in Bethpage, the study was lacking in scope and of the full extent of the plume, which extends roughly 4.5 miles long and 3.5 miles wide.

91. On or about May 13, 2015, the NYSDEC announced in a press release that finalized a consent order requiring Northrop Grumman to address elevated levels of groundwater contamination originating at its Bethpage site.

92. Under the Order, Northrop Grumman will be obligated to participate in the cleanup of groundwater originating at the site and cooperate with the U.S. Navy on a remedial design and

remedial action work plan the Navy submitted to DEC to remediate contaminant "hot spots" recently identified in the large OU-2 groundwater plume.

93.    In the May 13, 2015 press release, NYSDEC announced that the State Health Department, in consultation with the U.S. Agency for Toxic Substances and Disease Registry, is working to examine if there are any health impacts associated with exposure to groundwater contamination in the Bethpage and Calverton areas of Long Island. Consistent with a health consultation of this type, the contaminants to be evaluated are VOCs, specifically, tetrachloroethene, trichloroethene and subsequent breakdown products.

94.    On or about January 2016, Governor Andrew Cuomo ordered Defendant Northrup Grumman and the U.S. Navy to provide the Bethpage Water District and State of New York access to monitoring wells so they could further delineate the plume's migration.

95.    On March 16, 2016, the NYSDEC sent a letter to Defendant Northrup Grumman and Defendant Northrup Grumman Systems Corporation regarding the March 2013 remedy that was selected for the contamination at the Former Bethpage Settling Ponds. Despite signing Consent Order #W1-1183-14-05 in March 2014, the NYSDEC further urged Defendants to conduct the pre-design study of the March 2013 remedy that Defendants were bound to undertake pursuant to the Consent Order.

96.    On April 20, 2016, parts of the Bethpage Community Park were closed in connection with a New York State investigation into claims that large drums were found at the Site in the 1990s and were subsequently covered up.

### *The Defendants Have Not Remediated the Contamination*

97.    The remediation plans, if any, set forth by Defendants were and still remain inadequate and insufficient given the breadth of the contamination, as well as the present and historical migration of the harmful contaminants. Defendants have repeatedly failed to exercise

the reasonable care necessary to eliminate, correct, and/or remedy the dangerous condition created by them and/or located upon his land.

98.    Further, Defendants have intentionally delayed and repeatedly chosen meaningless courses of action, patently inadequate and unreasonable given the dire circumstances facing Plaintiff. Nearly three decades have passed since the contamination from Defendants' property was discovered, and Defendants have been unable to remediate or stop the plume presently injuring Plaintiff. The actions chosen and taken by Defendants were with knowledge that such delay and minimal action would cause the toxic contaminants to disburse and migrate off the Site and onto Plaintiff's land and property. These actions have been undertaken with actual malice and in wanton and willful and/or reckless disregard for Plaintiff's rights, health, and property.

99.    As a result of Defendants' negligent, willful, and/or wanton storage, disposal, and release of the contaminants into the soil and/or groundwater, and/or the subsequent and continuing failure to remediate or take reasonable action to mitigate the release and migration of said substances, there is a contamination located in or about various areas and neighborhoods of Bethpage, as well as surrounding communities, which has migrated and continues to migrate throughout these areas and neighborhoods and onto the properties of Plaintiff at dangerous levels, including at concentration levels in excess of federal and/or state regulatory limits. In addition, Defendants' failure to properly investigate, test and remediate the hazardous and toxic substances on his own real properties continues to allow dangerous chemicals to migrate onto Plaintiff's properties through the soil and vapor pathways.

100.    The presence of the contaminants in Plaintiff's environment and on Plaintiff's property has resulted in permanent and continuing harm to Plaintiff's persons and property.

101.    As the Contaminants migrate from Defendants' property across other properties and onto Plaintiff's properties, contaminants continually come in contact with, mix with, and react to

otherwise benign substances, materials, and chemicals. Such contacts, mixtures, and reactions foreseeably result in new, different and/or additional hazardous materials entering upon, trespassing, and interfering with the rights of Plaintiff as a result of Defendants' actions.

102.    Further, as the contaminants age and decompose, they create toxic byproducts and/or release noxious gases, fumes, and odors. Such harmful by-products rising through the soil become trapped under foundations, streets, and driveways and create a real and foreseeable risk of exposures to deadly toxins and odors.

103.    Due to the Defendants' negligent handling of hazardous and toxic chemicals at the Site, Defendants' failure to avoid spilling, unsafe disposal, and/or release of said toxic substances into the environment, failure to adequately warn Plaintiff of the condition damaging his properties, and failure to act reasonably in eliminating, correcting, and/or remediating the condition, Defendants, and each of them, are obligated to institute reasonable care and compensation plans to halt, prevent and correct injuries to all Plaintiff, his physical and mental well-being, his real and personal property, and his economic interests.

104.    Due to his proximity to the Site, Plaintiff would be, and are foreseeably and unnecessarily injured by the discharge of Defendants' contaminants, failure to warn, and failure to exercise reasonable care to eliminate, correct, and/or remediate the dangerous condition created and maintained by Defendants on and around the Site.

105.    Defendants knowingly and negligently released or allowed to be released toxic contaminants into the environment, and/or continue to allow the migration of toxic chemicals into the environment on and around Plaintiff's property.

106.    Plaintiff has been and continue to be exposed to these toxic contaminants by ingestion, inhalation, and dermal exposure.

107.    Plaintiff has been and continue to be exposed to these toxic contaminants through

dust dispersing through the air into Plaintiff's properties and surrounding communities; through migration of the contaminants into the water table and groundwater which percolates up through the soil, into the soil, and the environment and ultimately into the Plaintiff's home through the vapor intrusion pathway.

108.    In addition, Plaintiff has been repeatedly exposed to these toxic contaminants through contact with the air and soil at his home.

109.    The Defendants intentionally and/or negligently failed to adequately warn or advise Plaintiff and other members of the public as to the nature, extent, composition, effects, and location of the contamination, the fact that Plaintiff and his property were being exposed to the contamination, the nature of the contaminants and risks could change over time, and that exposure to the contamination could likely cause life threatening and permanent adverse health effects.

110.    The numerous egregious actions and incidents occurring at and near the Site by Defendants constitute an intentional and/or negligent breach of this duty of reasonable care, and blatant violations of New York State law.

111.    Defendants, through their negligent and/or reckless acts, have repeatedly and unreasonably invaded Plaintiff's right to possession and undisturbed occupancy of their residences, and have repeatedly trespassed by causing migration of toxic contaminants onto Plaintiff's real properties.

112.    Defendants, through their negligent and/or reckless acts, have caused continuing damage to Plaintiff's persons, as well as real and personal properties, and have caused continuous injury to the land values of Plaintiff holding real property due to devaluation resulting from negative publicity that has unfairly injured their competitive status in home equity and re-sale value in relation to real property owners similarly situated in areas outside of the areas affected by the plume and contamination.

113.    Plaintiff has suffered and continues to suffer various types of injuries due to the acts of the Defendants as hereinbefore alleged. Plaintiff, has, due to the acts of all the Defendants, suffered and continue to suffer sudden, repeated and continual invasions of his rights of possession and to undisturbed occupancy of his residence and living area.

114.    The Plaintiff who owns real property has, due to the acts of the Defendants, suffered and continue to suffer stigma damages and injury due to the creation of an unfair, competitive disadvantage by way of diminution of property value as compared with similarly situated unaffected real property. This injury has resulted, in part, from the numerous public interest reports in the printed press concerning the contamination.

115.    Due to the negligent and/or intentional acts of each of the Defendants, Plaintiff has suffered and continue to suffer from damage to the air, water and subterranean soils around the Site and Plaintiff's home. This crisis further concerns Plaintiff in light of the anticipated risk of potentially injurious and unhealthy vapors escaping through the surface of residential grounds and adjacent private property.

116.    Plaintiff has, due to the destructive acts of each of the Defendants, suffered and continue to suffer from the general diminution in the aesthetic qualities of his home and the area in which   he resided, caused by the total compounded effect of all of the above-described circumstances, causing injury to the visual, audible and physically sensible environment of the vicinity surrounding the Site.

117.    In order to compensate Plaintiff for damages suffered due to Defendants' acts, Plaintiff requires, among other things, that Defendants, and each of them, pay the past and future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to ascertain and treat the nature and extent of the injuries suffered due to the contamination emanated from the plume, with Plaintiff retaining freedom of

choice relative to choosing his experts. Many of these costs would not be covered by health care insurers, and if covered, may unfairly result in increased premiums.

118.    Furthermore, Plaintiff seeks compensation for: the diminution in the economic value of his personal and real property; residential soil and air space testing and monitoring; cleanup, removal and remediation of any and all contamination of Plaintiff's properties including the costs of investigation and testing of properties; repairs to real property damaged by Defendants; other damages; and attorneys' fees and costs as allowed by law, and any other compensation this court deems just. To the extent that Defendants' products have commingled, Defendants are jointly and severally liable for the damages from contamination in this case.

### *Fear of Cancer*

119.    Plaintiff has a justifiable and actual fear of developing cancer as a result of said exposure. With reasonable probability, the prospective, feared, and anticipated consequences may be expected to flow from the past harm.

120.    The degree of probability that Plaintiff will develop cancers is such that there is a reasonable certainty that such cancers will develop at some future date, thus entitling Plaintiff to recover from Defendants for apprehended consequences that are not presently manifested.

121.    A rational basis exists between Plaintiff's exposure to the above-described toxins and contaminants, and Plaintiff's currently manifested fear of developing cancer in the future.

122.    To the extent that Defendants' actions resulted in the discharge and/or release of toxic contaminants into the soil and groundwater, thereby entering and injuring Plaintiff's physical and mental well-being, his real and personal property, and his economic interests, Defendants are jointly and severally liable for all damages from contamination in this case, his physical and mental well-being, his real and personal property, and his economic interests.

### THE PARTIES

123.   The Plaintiff is a prior and current resident located at 152 11th Street, Bethpage, New York having lived there from December 1974 through 1993, and again from 1998 through 2003.

124.   The Plaintiff has resided in the surrounding neighborhood adjacent and of the Site.

125.   As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding his home, Mr. Romano has developed significant debilitating personal injuries, as well as damage to his personal property, including lung cancer. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr. Romano has suffered and continues to suffer severe physical injury, pain, and suffering. Mr. Romano brings suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

126.   The Plaintiff's causes of action related to soil contamination and exposure are continuing in nature. Plaintiff has and continues to engage in activities on his property that requires him to come into direct contact with subsurface and surface soil.

127.   Plaintiff was personally exposed and continues to be exposed to hazardous and toxic substances, contaminants, and pollutants from the above-mentioned sites via ingestion, inhalation, and or/dermal contact, during normal day activities such as walking in the neighborhood, gardening and doing yard work, playing at the Park, playing in his yards, as well as living in his home.

128.   The contamination and polluting events at the Site have not been stabilized or eliminated.

129.   The hazardous and toxic substances that Plaintiff was exposed to are environmental

contaminants as set out in Section 6.8.1 of the ATSDR Public Health Assessment Guidance Manual.

130.    Plaintiff is an 'exposed population' as defined in Section 6.8.1 of the ATSDR Public Health Assessment Guidance Manual as follows:

> A population is considered exposed if a completed exposure pathway, which links a contaminant with a receptor population, exists in the past, present, or future. An exposed population includes persons who ingest, inhale, or contact site contaminants or are exposed to radiation in the past, present, or future. Examples of exposed persons include those who:
>
> - *have ingested, are ingesting, or will ingest the contaminant from one or more environmental media;*
> - *have inhaled, are inhaling, or will inhale the contaminant from one or more environmental media;*
> - *have contacted, are contacting or will contact the contaminant in one or more environmental media; and*
> - *were exposed, are exposed, or will be exposed to gamma radiation from one or more environmental media.*
>
> *If an environmental medium (soil) contains a contaminant of concern at a point of exposure (a residential yard), and evidence already exists that a route of exposure (ingestion) has occurred, is occurring, or will occur, the health assessor should assume that persons living at that residence are exposed or will be exposed. If the residential yard contains a vacant house, the health assessor should assume that future residents will be exposed. Persons should also be considered exposed if exposure has been verified by human biologic measurements or medical examination. For health assessments, human biologic measurements or medical examination are not necessary for the assignment of an exposure category to a population.*

## **DEFENDANTS**

131.    Upon information and belief, Defendant Northrop Grumman Corporation ("NGC" "Grumman" or "Defendant") is a corporation organized under the laws of the state of Delaware, with its principal place of business at 2980 Fairview Park Drive in Falls Church, Virginia.

132.    Upon information and belief, Northrop Corporation, the predecessor to Northrop Grumman Corporation, acquired Grumman Corporation, whose primary place of business was in

Bethpage, New York, and it was incorporated under the laws of the State of New York.

133.    Defendant Northrop Grumman Systems Corporation ("NGSC" or "Defendant"), is a subsidiary of NGC, and is organized under the laws of the State of Delaware with its headquarters in Falls Church, Virginia. Upon information and belief, NGSC is the successor in interest to the Grumman subsidiary, Grumman Aerospace Corporation, which was headquartered in Bethpage, New York and incorporated under the laws of the State of New York.

134.    NGC and/or NGSC or their predecessors owned and/or operated the Site at the time of the disposal and/or release of the hazardous and toxic contaminants at the Site.

135.    When reference is made in this Verified Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

136.    The term "Defendant" or "Defendants" refers to all Defendants named herein joint and severally.

137.    Upon information and belief, each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiff, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing him injury, or in some other actionable manner.

138.    Defendants owned, operated and maintained the Site at all material times to this action.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION:
### NEGLIGENCE

139.   Plaintiff re-alleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

140.   Negligence may exist both as an omission as well as an affirmative act.1 A cause sounding in negligence allows for the recovery for an injury that was proximately caused by another's violation of a duty of reasonable care.

141.   Here, the Defendants Northrop Grumman Corporation and Northrop Grumman Systems Corporation, as owners and operators of business(es) at the Site that managed, stored, used and disposed of toxic contaminants and solvents, owed Plaintiff a cognizable duty to exercise reasonable care in the storage, transportation, and disposal of toxic chemicals including but not limited to volatile organic compounds ("VOCs"), such as trichloroethylene ("TCE") and its breakdown products, perchlorate, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, and carbon tetrachloride, and the maintenance of their tools and equipment used for such acts.

142.   Defendants breached their duty of reasonable care which a reasonably prudent person should use under the circumstances by negligently storing, transporting, disposing of, or otherwise causing the release into the ground toxic chemicals, including but not limited to volatile organic compounds ("VOCs"), such as trichloroethylene ("TCE") and its breakdown products, perchlorate, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, and carbon tetrachloride, and negligently permitting their release into the soil and groundwater in and around the Site and in the vicinity of Plaintiff's real property.

143.    The release of the Contaminants into the soil and groundwater is the proximate and legal cause of the injuries suffered by the Plaintiff to his health and well being and to his property and the adjacent properties.

144.    Upon learning of the release of the contaminants, Defendants owed Plaintiff a duty to timely notify Plaintiff that the aforementioned spills in the vicinity of Defendants' operations at the Site had occurred.

145.    Defendants breached that duty by failing to timely notify the Plaintiff of the spills of the contaminants at the Site, and, consequently, in the vicinity of Plaintiff's homes and rental properties.

146.    As a result of Defendants' breaches of their duty to timely notify the Plaintiff, the Plaintiff was forestalled from undertaking effective and immediate remedial measures and Plaintiff has expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

147.    Upon learning of the release of the contaminants, Defendants owed Plaintiff a duty to warn of the release of the contaminants and the dangers to the Plaintiff, his property, and neighboring properties that resulted therefrom.

148.    Defendants breached this duty by failing to adequately warn the Plaintiff of the release of the contaminants and the potential dangers and harms that could result.

149.    As a result of Defendants' breaches of their duty to warn the Plaintiff of the release of the contaminants and the potential dangers and harms that could result, the Defendants' actions and omissions are the proximate and legal cause of the injuries suffered by the Plaintiff to his health and well being and to his property and the adjacent properties.

150.    Defendants further had a duty to the Plaintiff upon learning of the release of the contaminants to act reasonably to remediate, contain, and eliminate the spill before it injured

Plaintiff and his property and/or to act reasonably to minimize the damage to Plaintiff's property.

151.    Defendants breached that duty by failing to act reasonably to remediate, contain, and eliminate the spill before it injured Plaintiff and his property and/or to act reasonably to minimize the damage to Plaintiff's property.

152.    As a result of Defendants' breaches of their duty to Plaintiff by failing to act reasonably to remediate, contain, and eliminate the spill, the Defendants' actions and omissions are the proximate and legal cause of the injuries suffered by the Plaintiff to his health and well-being and to his property and the adjacent properties.

153.    Defendants had a duty to the Plaintiff to ensure that their refining and storage facilities were safe and sufficiently secure as to prevent the release of the contaminants into the environment surrounding their facilities and into the Plaintiff's homes and rental properties and neighboring properties.

154.    Defendants negligently breached their duties to the Plaintiff to ensure that their refining and storage facilities were safe and sufficiently secure to prevent the release of the contaminants into the environment surrounding their facilities and, consequently, as a result of this breach, contaminants entered into the surrounding Plaintiff's home and rental properties.

155.    As a result of Defendants' breaches of their duty to Plaintiff by failing to ensure that their refining and storage facilities were safe and sufficiently secure to prevent the release of the contaminants into the environment surrounding their facilities, they are the proximate and legal cause of the injuries suffered by the Plaintiff to his health and well-being and to his property and the adjacent properties.

156.    Defendants had a legal duty to properly remediate the contamination from their activities at the Site and had full knowledge of the extent of the contamination and the threat it poses to human health and safety.

157.    Defendants willfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

158.    As a result of Defendants' breaches of their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety, they are the proximate and legal cause of the injuries suffered by the Plaintiff to his health and well-being and to his property and the adjacent properties.

159.    Plaintiff suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiff, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiff so apparent as to entitle Plaintiff to be protected against such actions or inactions.

160.    Accordingly, Plaintiff seeks damages from Defendants, in an amount to be determined at trial, directly resulting from the his injuries in a sufficient amount to compensate him for the injuries and losses sustained and to restore Plaintiff to his original position, including, but not limited to consequential damages for medical monitoring, the difference between the current value of his property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct in an amount to be proved at trial. Upon information and belief such amount exceeds the jurisdictional amount of the lower courts.

## AS AND FOR A SECOND CAUSE OF ACTION:
### STRICT LIABILITY

161.    Plaintiff re-alleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated herein.

162.    Activities such as the disposal of hazardous chemical wastes as is the case herein constitutes an abnormally dangerous activity for which strict liability will apply.

163.    Defendants' aforesaid failure to employ reasonable care which a reasonably prudent person should use under the circumstances by storing, transporting, disposing of, or otherwise releasing into the ground dangerous contaminations, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride, constitutes ultra-hazardous and abnormally dangerous activities involving ultra-hazardous, abnormally dangerous substances.

164.    Defendants allowed or caused these ultra-hazardous and abnormally dangerous substances to leak into the surrounding land and ground water, and in doing so, failed to warn Plaintiff of the dangerous condition that was caused thereby.

165.    The risks posed by such activities outweigh any value associated with the same. As the result of said ultra-hazardous and abnormally dangerous activities, Plaintiff has suffered damages and imminent, substantial and impending harm to his health, families, and home values. Plaintiff has expended or will be forced to expend significant resources to safeguard his health and property, obtaining monitoring, testing, remediation services or equipment, as well as health monitoring, indefinitely for years and decades into the future.

166.    By reason of the foregoing, Defendants are strictly liable in tort for the damages sustained by Plaintiff.

167.    Accordingly, Plaintiff seeks damages from Defendants, in an amount to be determined at trial, directly resulting from the his injuries in a sufficient amount to compensate him for the injuries and losses sustained and to restore Plaintiff to his original position, including,

but not limited to consequential damages for medical monitoring, the difference between the current value of his property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct in an amount to be proved at trial. Upon information and belief such amount exceeds the jurisdictional amount of the lower courts.

## AS AND FOR A THIRD CAUSE OF ACTION:
## <u>NUISANCE</u>

168.    Plaintiff re-alleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

169.    Under a cause of action for private nuisance, Parties may be subject to liability for environmental contamination if their conduct invades another's private use and enjoyment of land and if such invasion is: 1) intentional and unreasonable; 2) negligent or reckless; or 3) actionable under the rules governing liability for abnormally dangerous conditions or activities.3

170.    Defendant Northrop Grumman Corporation and its predecessors owned and continue own, occupied and continue to occupy, and controlled and continue to control the real property at the Site.

171.    Defendants owned, occupied, controlled and/or still own, occupy and control their real property in such a way as to create and/or maintain and continue a dangerous and/or hazardous condition.

172.    At all times mentioned herein, Defendants had knowledge and/or notice of the dangerous condition that the contaminants and the plume presented and failed to take reasonable acts to cleanup, correct, or remediate that condition.

173.    Additionally, Defendants owed a duty to Plaintiff to take reasonable action to

eliminate, correct, or remedy any dangerous condition existing on Defendants' property that was reasonably foreseeable to injure Plaintiff and/or Plaintiff's real property, and of which they had knowledge and/or notice.

174.    Further, Defendants owed a duty to Plaintiff to exercise reasonable care and skill in the construction, maintenance, use or management of their property to prevent a structure, appurtenance, or condition thereon from endangering the neighboring premises and occupants. Defendants have breached these duties, and each of them, by negligently, willfully, and/or wantonly creating a dangerous condition on their property by allowing massive quantities toxic contaminants to be spilled, disposed of, or otherwise released into the ground, soil, groundwater and/or aquifer on their property. This dangerous condition is reasonably foreseeable to cause injury and damage to Plaintiff and his property due to the size and nature of the releases of the Contaminants and the proximity of Plaintiff and his properties.

175.    Defendants owed a duty to Plaintiff to exercise reasonable care to keep the dangerous contaminants and their byproducts from being discharged or allowed to escape, enter surrounding properties, and cause injury and damage.

176.    Defendants breached their duty to Plaintiff by failing to exercise reasonable care and skill in the construction, maintenance, use or management of their property to prevent a structure, appurtenance, or condition thereon from endangering the neighboring premises and occupants. Specifically, Defendants negligently, willfully, and/or wantonly allowed massive quantities of Contaminants to be disposed of, or otherwise released into the ground, soil, groundwater and/or aquifer at the Site.

177.    Defendants further breached their duty to Plaintiff by failing to exercise reasonable care and by maintaining their property in such a condition as to allow and fail to prevent large and unknown quantities of the Contaminants to degrade, mix with other chemicals, and escape from

their property and enter onto and under Plaintiff's property. The above-described breaches endangered, injured, and damaged the neighboring premises and occupants. Such a dangerous condition is reasonably foreseeable to cause injury and damage to Plaintiff and his property.

178.    Defendants also breached their duty by continuing and maintaining this dangerous condition at the Site that was reasonably foreseeable to injure Plaintiff and/or his real property.

179.    Plaintiff has suffered foreseeable injury and damages proximately caused by the negligent creation and/or maintenance of the dangerous condition by Defendants.

180.    Defendants owed a duty to Plaintiff to refrain from creating and/or maintaining a dangerous condition on Defendants' properties that was reasonably foreseeable to injure Plaintiff and/or his real property.

181.    Defendants' breach that duty by causing dangerous Contaminants to be released onto Plaintiff's land and caused noxious gases, fumes and odors to emanate from their soil into plaintiff's home.

182.    Accordingly, this breach has caused Plaintiff injury to his person and property that is certain, substantial, and this resulting condition interferes with Plaintiff's physical comfort.

183.    Plaintiff seeks general damages from Defendants, in an amount to be determined at trial, directly resulting from his injuries in a sufficient amount to compensate him for the injuries and losses sustained, and to restore Plaintiff to his original position, including, but not limited to consequential damages for medical monitoring, the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, and the direct and consequential damages flowing from the trespass and resulting condition which are the natural and proximate result of Defendants conduct in an amount to be proved at trial. Upon information and belief, such amount exceeds the jurisdictional amount of all lower courts.

## AS AND FOR A FOURTH CAUSE OF ACTION:
## <u>TRESPASS</u>

184.    Plaintiff re-alleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

185.    Environmental contamination of a property constitutes a trespass as it interferes with the conditions of the property. This act of trespass is, in and of itself, objectionable.

186.    Upon information and belief, Defendants had exclusive control over the Sites at all relevant times.

187.    Upon information and belief Defendants' negligent, willful, and/or wanton actions and/or intentional failures to act caused an uncontrolled quantity of Contaminants to be spilled, disposed of, or otherwise released into the ground, soil, groundwater, and aquifer at the Site.

188.    Upon information and belief, the contaminants spilled, disposed of, or otherwise released into the ground, soil, groundwater, and aquifer at the Site entered and trespassed upon the land and realty of the Plaintiff, thus interfering with the condition of Plaintiff's property and the neighboring properties, causing an injury to his possession and/or right of possession.

189.    Upon information and belief, Defendants took affirmative, voluntary, and intentional actions to store, use, and transport in an unsafe manner and/or intentionally to dispose of the contaminants into the ground.

190.    Upon information and belief, at the time that the above described affirmative, voluntary, and intentional acts were performed, Defendants had good reason to know or expect that the large quantities of contaminants would pass through the soil, groundwater, and aquifer from Defendants' land to the land of Plaintiff and the neighboring properties.

191.    Upon information and belief, the above-described affirmative, voluntary, and

intentional acts were performed with the willful intent to cause the Contaminants to be disbursed through the soil, groundwater, and aquifer without regard for the inevitable transport onto the land and property of Plaintiff and the neighboring properties.

192. Defendants' actions in disposing of uncontrolled amounts of the Contaminants into the ground were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiff's rights, health and property.

193. These voluntary actions resulted in the immediate and continued trespass of the Contaminants on the Plaintiff's property, thus interfering with the condition of Plaintiff's and neighboring property, causing injury and damage to Plaintiff, his property and his right of possession of his property.

194. Additionally, and/or alternatively, Defendants' decision to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the contamination of the soil, groundwater, and aquifer on their properties after having knowledge and notice of said contamination were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiff's rights, health and property.

195. Further, Defendants' actions were patently insufficient to eliminate, correct, and/or remedy the contamination after having knowledge and notice of said contamination were made with actual malice and in wanton and willful and/or reckless disregard for Plaintiff's rights, health and property.

196. These actions resulted in the trespass of the Contaminants on the Plaintiff's properties, thus interfering with the condition of Plaintiff's property, causing injury and damage to Plaintiff, his property and his right of possession of his property.

197. Based upon the above, Plaintiff seeks general damages from Defendants, in an amount to be determined at trial, directly resulting from his injuries in a sufficient amount to

compensate him for the injuries and losses sustained by Plaintiff and to restore Plaintiff to his original position, including, but not limited to, consequential damages for medical monitoring, the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct, and exemplary or punitive damages.

## PUNITIVE DAMAGES

198.    Plaintiff re-alleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

199.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and trespasses upon Plaintiff's property, disregarding the property rights of Plaintiff.

200.    Defendants' willful, wanton, malicious and/or reckless conduct includes but is not limited to:

a.    Issuing no warning to Plaintiff concerning the release of PCBs and VOCs from its facility, in the vicinity of Plaintiff's property;

b.    Knowing but failing to disclose to Plaintiff the certainty of long-lasting water contamination, including specifically high risks to the aquifer, groundwater and production areas, by the use, management, storage and/or disposal of the Contaminants; and;

c.    Defendants' blatant disregard for the safety of the public when they failed to appropriately remediate the contamination after the Contaminants were detected.

201.    Defendants have caused great harm to Plaintiff's property and water supplies and demonstrated an outrageous conscious disregard for Plaintiff's safety with implied malice, warranting the imposition of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against the Defendants herein on all causes of action, in a sum exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction, together with the costs and disbursements of this action.

Dated: Garden City, New York
July 10, 2025

Yours, etc.

Jay J. Massaro (7924)
DELL & DEAN, PLLC
*Attorneys for Plaintiff*
1225 Franklin Avenue, Suite 360
Garden City, New York 11530
(516) 880-9700